Good morning. May it please the Court, my name is Steve Bizarre and I am privileged to represent the remaining appellants, Arkema, Inc., Arkema, France, and FMC Corporation, and I'd like to reserve five minutes for rebuttal. This appeal is from an order certifying a class in an antitrust price-fixing case spanning 11 years, from 1994 to 2005, and three distinct products, hydrogen peroxide and two products, sodium perborance and sodium percarbonates, about which the plaintiff's expert report and the District Court's opinion say virtually nothing. I want to say at the outset that we are not here asking the Court to change directions or to overrule or limit line or board its decision in any way. We don't have to do that here because the plaintiff's theory of common impact in this case is very unusual. It makes this case a very different case than line or board. Unlike line or board, this is not a case of the alleged violation causing prices to go up, but one where the plaintiff's theory of common impact is that prices are steeply declined. What kind of test do you want us to do? I'm thinking of the predominance requirement. In other words, do individual claims or do common claims predominate over individual claims? Looking at what other circuits have done, and I'm looking in particular at the Second Circuit opinion and the IPL from Judge Newman, they're saying that, look, what they had done previously, the Second Circuit was all over the map and that some evidence of predominance they had previously stated, but they're now looking at what's been done and they're saying that you must make a finding and some evidence won't do, and while you don't necessarily decide the merits, you have to delve into them to some extent. What are you asking us to do? Well, I want to be very clear about that. We're not asking this court to require a mini-trial on the merits and certainly not a trial on the merits for the merits' sake. That's been settled for some time, and I think the Newton decision is very helpful in that regard. But I do think it's sometimes helpful with regard to the hearing aspect, and I will come to the thrust of your question.  And sometimes it may not be necessary. There may be a situation where a class certification motion can be decided on the pleadings, but sometimes it may be necessary because the case is complex. And certainly a settled proposition in this court and all the other courts that the court has to make all necessary factual and legal inquiries to determine if the Rule 23 requirements have been met because the court has the obligation to protect absent class members, the defendant's due process rights, and the court's resources. And it's an important obligation. What would be the standard? You've given an indication that if the court is going to require this, we're not going to require findings of fact and conclusions of law, but do we adopt a preponderance of the evidence standard? Do we adopt a more general standard like more likely than not? Most courts have either neglected or refused to pin it down. What do you think? Well, I do think that the preponderance of the evidence standard is the appropriate standard because it's a neutral standard, and I don't think there's much opposition from the plaintiffs to that standard in their papers. And we've set forth the reasons for that standard at length in our briefs. But with regard to the question of whether findings are important, I think you can certainly point to the language in Rule 23b-3 which talks about the court having the obligation to find. And the new motor vehicles case from the First Circuit goes through a litany of the cases in other courts of appeal where courts have required findings. The Second, the Fourth, the Fifth, and the Seventh Circuits are certainly in that camp. And so there is a thrust in that direction. And I think this court's decision in Newton, frankly, is on all fours with those cases because Newton requires the court to determine whether resolution of a question, and I quote, requires, close quote, individualized inquiry, which to me reads as the same thing as to make a determination. Whether we call it a finding, whether we call it a determination, I think the point is that the court has to address the record that's presented to determine whether if the plaintiffs are trying to prove an aspect of their case, an element of their case, with common proof, it impacts all class members. Whatever the standard, what didn't the court do here that they should have done? The court made four distinct errors, each of which I think is critical to why the court got the wrong result. Number one, the court misapplied the Boghossian presumption. Boghossian's presumption is a presumption of causation. It's not a presumption of injury. The court stated at page A-17 of its opinion, and I quote, we begin by noting that in horizontal price-fixing cases, courts have often been willing to presume impact once a conspiracy is shown. In other words, a district court standard in looking at Boghossian or trying to apply Boghossian through a liner board type blueprint to this case was that common proof of conspiracy entitles you to a presumption of loss. That is directly contrary to Boghossian, and it's directly contrary to the way that this court interpreted Boghossian in footnote 21 of its Newton decision. In Newton, where the court was drawing, or Judge Sirica was drawing directly from Boghossian, this court wrote, in antitrust class actions, injury may be presumed when it is clear the violation results in harm to the entire class. That's a quote. This court further wrote that proof of impact can be made on a common basis, and I quote, so long as the common proof adequately demonstrates some damage to each individual. In other words, the district court applying Boghossian and Newton and liner board was required to look at the circumstances of each case to see whether damage could be shown as to each individual. Once that was done, it was entirely appropriate for the court to presume, as the court did in Boghossian and liner board, that the conspiracy, the alleged conspiracy, was the cause of the damage. Second, the court made a mistake with regard to how it assessed expert testimony. The plaintiffs argued in their brief below, and you can see this in the appendix at page 116, that the court's not obligated to class certification to weigh or resolve conflicting expert testimony. They cited the microcrystalline case. The court obviously felt that that was the rule, because the court, number one, did not address Dr. Orover, the defendant's expert in its opinion. He's only mentioned twice. So wasn't that on the Daubert motion? No, no, Judge Fischer. In fact, it's twice. Certainly, he does say it on the Daubert motion. I'll come back to that. But there's no necessity to weigh the competing experts' report in the Daubert stage, is there? Well, I think the Daubert analysis actually bleeds over to the class certification analysis. But in the district court's discussion of class… That's an admissibility statement. Daubert obviously is an admissibility statement. Absolutely. And it's a red herring here, because a court from our position, a court may find an expert opinion is admissible under Daubert, but entitled to a little weight. That was what happened in the Blades case. I'm sorry. I interrupted Judge Fischer on this question. My point is this. In discussing the class certification standards at page 10 of the appendix, the district court stated, and I'm quoting again, And then again, at page 13 of the appendix, the district court wrote with regard to the Daubert analysis, Twice the district court said that in response to the plaintiff's briefing that position, and the Daubert statement bleeds over into the analysis, because Dr. Ordover's report, which I'll come to in a moment, is not addressed at all in any meaningful way. It's treated as a lawyer argument. The defendants claim, the defendants contend, the defendants argue. The only two times that Dr. Ordover is addressed specifically is one time on page 12 where the district court says, Dr. Ordover's conclusion is of no moment, and the second time when it's being cited on page 14 in a footnote for a neutral proposition that has nothing to do with the challenge that Dr. Ordover mounted to Dr. Byer, the plaintiff's expert. The third error, standards-based error, was the district court misapplied, misrelied on the threshold-showing language from the district court's opinion in Leiner Board, which was reproduced in this court's opinion in Leiner Board at the Third Circuit. As I mentioned, as we mentioned in our briefs, and we discussed this at some length, threshold-showing is essentially the same as a prima facie showing. If that was all that was required under Rule 23, there would have been no reason to amend Rule 23 in 2003 and to defer the time of a class certification decision from as soon as practicable after the commencement of the case to an early practicable time. In addition, the IPO decision would have been wrongly decided because in IPO, the Second Circuit held that plaintiffs have the burden of establishing and the court must find that the Rule 23 requirements have been met, not just supported by some evidence. Fourth error. Is the Rule 23 language as amended in threshold mutually exclusive? I think the idea of a threshold-showing is inconsistent with the idea that the district court should defer the class certification to an early practicable time, and if it's not satisfied at the time it makes the decision, it should delay the decision. That brings me to my fourth point, the fourth error. The district court stated a policy position which is directly at odds with the appropriate policy. It stated that in an antitrust case, when in doubt, it should err in favor of certification because it's an antitrust case. The 2003 Rule 23 amendment suggests that when in doubt, it shouldn't err at all. It should defer the class certification decision until the doubts have been resolved. That's the advisory committee's... The notes of the advisory committee make that point very expressly. But in the Supreme Court's decision in Falcon, you can glean that same point. Falcon was a Title VII case where there are equally persuasive and important policy considerations, and that did not prevent the Supreme Court from reversing the class certification ruling. Remember, antitrust rules are concerned with efficiency. They're concerned with compensating the injured. But they're also equally concerned with making sure those who have not been injured do not get a windfall. And the district court's announced policy in favor of class certification is not the appropriate policy. Let me take you back to three other issues that we have with the district court's opinion and with the district court's treatment of experts and failure to resolve conflicting expert issues. Dr. Byer, the plaintiff's expert, was offered to support the notion that there was common proof available. I think Judge Ritter... I'm sorry? No, I think we're going to run over our time here, so we'll give each side an extra ten minutes. Thank you. That will spare me the unwarranted begging that I would otherwise make at this point. This case is much more like the Newton case. And the motor vehicle case than the airport case. Let me just ask you a sort of big-picture question. If we determine that more needed to be shown and that this case should be set back in order that the, for example, the predominance requirement more needed to be shown, isn't it pretty much a fait accompli that ultimately it will be shown and the class will be certified? I don't think that's the case here at all, Your Honor. And I'm glad you asked that question because it allows me an opportunity to highlight what I think are the really distinguishing facts about this case from a case like Leinert Ward where a class was certified. Remember, in Leinert Ward, we had a situation where we had a very intuitive, logical set of facts. We had production and capacity restrictions that had the causal effect of causing increased prices. And it was easy for the plaintiffs to come up with a model of before the capacity restrictions price was the competitive price and after capacity restrictions price was the conspiracy price. This case is not like Leinert Ward. And just to draw out Leinert Ward a little bit more, it was a two-year class period. The price increases were mounted in six consecutive escalations. And the prices went, in that case, from $270 per ton of Leinert Ward to $530 per ton. In our facts, which are completely different, number one, according to the defendant's expert who was not considered by the district court, production and capacity were increasing, not declining. But their prices were also increasing. No, they were not. They were not? No. In our case, the prices at the end of the class period in 2005... Didn't Dr. Ordenburg say that they were at least stable or increasing? No. He said that costs were stable or increasing. And you can see that in his report, which is reproduced on page 313 of the appendix. And he's referring to variable costs, the cost of raw materials. But wouldn't the presence of all those three things, stable costs, the decreasing prices, and production increasing, don't they sort of lay a good climate for the presence of anti-competitive conditions? No. I can give you several examples where there would be anti-competitive conditions beyond the Leinert Ward example. Obviously, the Leinert Ward is a clear example. You could have a situation where the prices of hydrogen peroxide stay the same, flat, but the costs, the input costs, the raw material costs or the variable costs are declining. In that situation, you could have a difference between the flat price of hydrogen peroxide and the predicted price based on the lower input costs. That would be a situation where you might have at least a logical theory for why there would be an anti-competitive effect on people. And if you coupled that with a production restriction, you'd be even on a more sound footing. Similarly, if the hydrogen peroxide prices fell but the input costs fell even faster and you had a delta, a difference, between the two and coupled that with a production restriction, you'd be in a situation where there could be at least a theory of anti-competitive impact and then you'd want to test that theory. Our case is nothing like either of those cases. Here we have production increasing dramatically throughout the class period. We have raw material costs and energy costs rising or stable. You have hydrogen peroxide prices declining so that in 2005, they were 40% on average lower than they were in 1994. And in addition, and this is the kicker, when you look at the actual prices, the actual market outcomes, what happened to actual customers, you see that there's a wide variance, a wide variety of experience. Many more customers experiencing price declines than increases over the class period. Don't you have to add to all that the fact of the admitted antitrust violations, both in Europe and in the U.S.? I'm glad you asked me that question, Judge Fischer, because the admitted antitrust violations, while important, perhaps proof of some conspiracy, are not proof of the conspiracy that's alleged, an 11-year conspiracy in this case, against six defendants, several of whom, including the clients I'm speaking for today, have not pled guilty, number one, in the United States to any antitrust violation. And number two, it doesn't in any way mitigate the obligation of the plaintiffs to show impact on all class members. They still have to show impact, and Dr. Orton makes that point very clearly in his report, and the district court pays it no heed. Individual injury is an element of liability here. Spend a little bit of time on Dr. Orton. Let's assume that we agree with your position that the district court did not either consider or adequately consider his testimony in making this determination. But at least implicit, if not explicit, in the district court's order was that, look, these are matters that can be fought out at trial, and I don't have to, even if I were to weigh it, I don't have to make that decision at the current time. Tell us why Dr. Ordover's testimony makes it more likely than not that Dr. Byer will be unable to come up with some mechanism to prove on a common basis rather than on an individual basis the liability and the damages here. Dr. Ordover identifies in his report and explores further in his deposition testimony three salient errors that Dr. Byer made and or that the district court did not consider that really impact the ability of the plaintiffs to show common impact class-wide, and I'd like to explain those to you. The first is DuPont. Dr. Byer asserted as part of his boilerplate market study that the defendants jointly have market power, and because of that, there would be common impact because purchasers could not avoid the conspiracy. Dr. Ordover showed in his report, and he mentions this in footnote 28, and it's explored further in his deposition testimony, that the defendants' large market share or market power is not sufficient to demonstrate common impact if other producers of hydrogen peroxide were not a part of the cartel. DuPont, a major multinational corporation from Judge Ambrose's home state, was a 30% producer of hydrogen peroxide during the class period, a 30% market share of hydrogen peroxide during the class period for five of the 11 years, maybe six, because after they sold their plants, they continued to sell some hydrogen peroxide. DuPont was an opportunity for class members to either threaten to go to DuPont in their negotiations with the alleged conspirators and to thereby get a better price, or to actually go to DuPont and get a non-conspiracy price. Dr. Byer didn't consider DuPont at all. He excluded it, and the court, the district court, said, well, this may be a credibility issue later, but that's for later. That's number one. Number two, price increase announcements. Plaintiff's expert, Dr. Byer, pointed to price increase announcements as evidence that class-wide impact can be established by common proof, ostensibly because the price increase announcements were applicable to all products, grades, and concentrations. He did not offer any economic testimony on this point. He simply wasn't purporting to analyze the relationship between the price increase announcements and actual transaction prices. He simply said that the price increase announcements were evidence of common intent to impact class members. Newton teaches us that it's not intent that matters, it's effect, it's adequately demonstrating some damage to each individual under the circumstances of the case. But putting that to the side, the district court didn't even take up the question of price change announcements. But the knowledge that individual prices have a common, shared, common component. You have a baseline. That's the, you get right to where the district court got, which is, well, let's say this is a list price case, because the district court was trying, I think, to square this case with other cases that were list price cases. If there's a list price increase, a rising tide will float all ships, albeit they may float at different levels. But then the question is, is there a rising tide? This isn't line of work. There is no rising tide. The tide was declining by 40% over the 11-year class period, on average. Dr. Ordover looked at the actual impact of the price increase. What was the basis, then, of the European and American decisions that there were antitrust violations here? First of all, just with regard to Europe, this is a product that does not ship across the ocean. It's important to know that. Europe, there was an investigation, and various people sought amnesty. It's a different system, and I make no apologies for what happened in Europe. Fines have been assessed. What was the basis for that? The basis was that there were meetings over a period of time in which, at least by some accounts, prices or the effort to get prices to a better level were discussed. And those meetings involved the people that sought leniency in Europe. In the U.S. And your clients were not part of those meetings at all? In Europe, our clients sought leniency and was. But in the U.S., our clients, Arkema Inc. and Arkema France, were not. We've not been indicted, and I have no reason to believe we will be indicted. And we're not quite guilty. And I have no reason to believe we will plead guilty. And the facts show, and the record is replete with this, that Arkema was, in fact, a tremendous competitor. And much the same can be said for FMC. And you can see the evidence of that competition in Dr. Hortover's report at paragraphs 60 and 61, where he takes deposition testimony and documents and samples them and explores the individualized nature of the discussions. Let me come back to these price increase announcements. Dr. Hortover looked at them. In three years of the 11-year class period, there were no price increase announcements, 1996, 97, and 98. In three other years, 1999, 2003, and 2004, the price increase announcements had no effect on prices. The prices remained stable in response to the announcements. And then, when Dr. Hortover looked at a period of time, two and a half years from 2002, the first six months of 2002, to the last six months of 2004, where there were price increase announcements and analyzed them against the prices, the actual market prices for hydrogen peroxide, he found that about 50% of the time, prices declined in response to the price increase announcements. Very few prices, only 12%, actually increased by 5 cents or more and concluded, therefore, that there was no tendency for prices to go up in response to the price increase announcements. But what did Dr. Bayer find in contrast to that? He didn't find anything. He only said that the price increase announcements were evidence of a common intent to affect prices. He didn't look at it empirically. Pricing studies. Assuming that you're correct, and I guess I come back, at least for me, to full circle to, what tests do we use in order to determine if the predominant standard has been met? I think that in a situation like this one, where the plaintiffs are essentially advocating what is a novel theory, a theory that the prices would have gone down further and faster in a very unique constellation of facts, that the court has to... And where that novel theory depends on... I think the court has to, in looking at that novel theory, see whether it's worn out by the facts or whether the facts and the data upset the theory, as the Seventh Circuit warned in West. Actually, it doesn't make any difference if it's a novel theory or whatever that theory is. To see if it... If there's a gaping hole in the theory or if there's a disconnect between the theory and the record evidence, that's the situation in Newton where the theory was refuted by the record evidence. In new motor vehicles, there was a gaping hole or an undeveloped theory. So those are two cases where, because there's a gaping hole or a disconnect, the court felt that certification was not warranted. And it sounds like what you're saying is some evidence will suffice in order to meet the predominant standard. And all you're saying is there really isn't some evidence here because there's a gaping hole in it. Well, I think that here we have a situation because of the unique constellation of facts where there is no evidence, where the plaintiffs haven't shown impact not to one percent of the class, let alone virtually all of the class. Okay. Good. Any other questions? Okay. Mr. Mazar, thank you very much. We'll have you back on rebuttal. Mr. Harrenson. Good morning. Good morning. May it please the court, I am Greg Aronson of Captain Fox, and we represent the plaintiffs' appellees here. And, Judge Ambrose, I know you're concerned about the standard, and if you bear with me, that's where I would like to start. That'd be perfect. In AmCamp, at page 625, the Supreme Court said, quote, Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws. So we know there are certain cases where predominance is readily met. In the securities area, what are those cases? Those are fraud on the market cases where you've got an efficient market hypothesis underlying the fraud on the market theory. In those cases, reliance and injury can be presumed, and you're going to have common questions under Rule 23b-3. What are those cases in the antitrust area where predominance is a test that can be readily met? Those are cases of horizontal price-fixing and output restriction where the market characteristics are conducive to collusion, and there is pricing structure, because if those factors are present, just as they were in line and board, then you will have conspiracy and injury being common questions, and the class can be certified. And so therefore, what a court does to determine whether or not in the fraud on the market case the securities case, actually, or in the antitrust case, is whether these factors are there. If these factors are there, the class is certified. And as we will get to, these factors are here in this case. If they're not, then further scrutiny is required. If the theory is novel, as it was in the new motor vehicles case, you have to look further. And let's take a look at a few of the cases that are in the record. That's right where I am. If you would comment on the First Circuit case and the Second Circuit case, because, at least to me, they make sense, in the new motor vehicles, I think, of the First Circuit, and the IPO case that Judge Newman wrote in the Second Circuit. Newman in the IPO case, right? Yes, sir, Judge Newman wrote it. But you're not referring to the McLaughlin case, which is also a Second Circuit case that defendants brought to your attention last week. No, I'm referring to Judge Newman's decision. Okay. I didn't hear that last week. I said I'm referring to Judge Newman's decision. Newman's decision. Okay. Well, let's start with IPO, then, if you don't mind. No problem. That was a securities case. That was a case of trying to extend the fraud in the market theory to public offerings. But I didn't see Judge Newman really limiting this to a securities area. No, he wasn't. He was talking more general about what the standard was. But what he was saying in this case… And ultimately rejected the sum evidence standard that the Second Circuit previously had used. Well, I'm not sure the Second Circuit had used it, but certainly Judge Shindlin in the district court used it, and that was being rejected. Right. And if she took that direction from Judge Newman in Kharadad, then that was being rejected, too. It was understandable why she took that direction, because the Second Circuit, he believed, his own court had muddied the waters at times. No question. But on the other hand, what was being applied… The law was being straightened out by Judge Newman in the Second Circuit. But I would submit that what Judge Newman was doing, and I think he said it somewhere, was consistent with what this court did in Newton. And the standard really isn't any different. You take a look at the facts when it's necessary. If you look at page 41 of the IPO case, that's the fourth factor. They summarize what it is that the standard should be in the Second Circuit. And the fourth is you only take a look at the merits to the extent that's necessary. Why would it be necessary in this case to take a closer look at the facts? Well, we haven't quite gotten there, but I'll be happy to answer that. If you take… Excuse me, I'm losing my voice. If you take a look at what happened here, we've got a case where it's a horizontal, price-fixing, output-restriction case. We've got a case where there are market characteristics, and that was never mentioned by my adversary in his litany of what it is that the experts were looking at. But we've got market characteristics here, just like we did in Liner Board, which, if you look at them, mean, and which Dr. Byer concluded in his report mean, that there would be impact on all of the customers from the alleged conspiracy. That is, we've got market power due to the concentration, we've got geographic overlap, we've got fungible products, and we have realistic demand. There's a dispute over the fungibility of the products. Oh, I'd love to talk about that. The dispute over the fungibility of the products is at the level of rather different concentrations. There's 35%, there's 50%. Sometimes you throw in a couple of chemicals in addition, if you have to, if that's necessary for storage or something like that. I think that's the argument about fungibility. And I just happen to have something from the record, testimony from one of the plaintiffs, let me make sure I've got it, that I hope will help explain this. And it's at Supplemental Appendix, page 1831. I really am losing my voice. And it's testimony... Do you have water there? No, there isn't, but I'll ignore it and keep going if you don't mind. We'll get you some. Somebody get me some water. He was strong yesterday. One of my adversaries. The pump was still on. Right. Here we are. Page 1831, the Supplemental Appendix. It's a transcript of John P. DeMarco. He's from Arco Chemical, they're one of the plaintiffs. It starts at page 166. Is the allegation, that's the question, that hydrogen peroxide is a highly homogeneous product consistent with your testimony that you would not accept delivery of 50% hydrogen peroxide if what you ordered was 35% hydrogen peroxide? Answer, yes. Question, how so? Answer, milk is homogeneous, which means that it is. I don't get into homogeneous, but milk, skim milk, I'll give you an example, is a commodity. But you would not accept skim milk if you wanted whole milk. Question, do you? Answer, he continued on, he was being interrupted. They're both still commodities. Question, do you agree with the statement that hydrogen peroxide is purchased primarily on the basis of price? Answer, yes. So Judge Sirica, that's the answer to the claim that they're not fungible products. They are fungible products. Even perborate is fungible, it's all the same powder. Percarbonate, it's all the same powder. And hydrogen peroxide, different concentrations across what it is that a customer wants, it's the same product. And if you look even further in the record, I think it's paragraph 24 of Dr. Byers' affidavit in the record, I don't remember the page number, I'm sorry. There he specifically goes through all of the swaps. And there are numerous swaps among the defendants of their own hydrogen peroxide. They sell their competitor's product without a problem whatsoever because it's all the same stuff. It's homogeneous. Is the pricing structure here the same as it was in Liner Board? Well, that's a complicated answer. That's why I asked. There are two aspects to it, and I want to discuss both of them, if I might. But let's talk about the two aspects. There is the price announcements that my adversary has already referenced, and there is also the structure to the pricing movement over time that's very similar that is also in the record. Both of those were fine. Charts and graphs, analysis of the transaction data, just as was done in Liner Board, was done by Dr. Byers here. And let me start with the price announcements, if I may, Your Honor. Would you rather talk about the charts and graphs? Yes. You go ahead. Okay. The price announcements. I think my adversary conceded that they were effective across all products. And if you take a look at Dr. Byers' Table 10, he's got the list of the price announcements over time that the various defendants took a look at, and I think that's at page 169 of the appendix. And then, if you look on the next page, he's got a footnote, little B, and if you look at the footnote, you will see that that means that it's across all products in most of the price announcements. Not all of them, but most of them are across all products, and most of them are in the same amount. That is, whatever it is. If it's four cents a pound for one, it's four cents a pound for all the other. It's parallel pricing. That's what we've got. And when you've got price announcements like that, as this court said in the Flat Glass Cylinder in Judgment Opinion, which is at 365 F3rd, page 362, sellers would not bother to fix list prices if they thought there would be no effect on transaction prices. Now, my adversary said, that's list prices, that's not announced prices. I'm sorry, I know the record in Flat Glass. I was one of the plaintiff's lawyers in that case, so I didn't argue the appeal. My partner did. And they were announced prices. Did you win on the deal? Yes, actually, we did, Your Honor. So it was because of your partner? Obviously, it was because of my partner. Bob Catlin was responsible for it, and whatever help I may have given him on the side. You did the brief, right. But he gets full credit for that. In any event, the point is, and it is the important one, when you have price announcements, whether they are list prices, or whether they say, all your prices are going up by 5 cents a pound starting in a month, that does affect everybody. Even if you're a large purchaser, and you say, hey, they can't do that to me, I'm a volume purchaser. Go off and take a look, and see if you can get the price announcement not applicable to me. Well, there's going to be some effect, excuse me, some effect there, if you have to go and negotiate, oh, yeah, fine, we're going to give it to you for 1 cent, or we're going to give it to you at the end of the year, or something like that. And since we're still talking about pricing structure, let me see if I can find, ah, there it is. Page 1025 of the record, Supplemental Appendix. There's a document there. It's an ARCMA document, that innocent, not participating here. But there's an ARCMA document, and it talks about the effect of the price increases. And let me quote it. I'm sorry, it's a little long, but I would like to quote it. Quote, price, and actually it's by Mr. Blackburn, it's a quarterly report, and he, I think, was either the president of the U.S. subsidiary, or he was in charge of the sale, I don't remember which. Quote, price, reflects the March 00 price increase, $110 per metric ton, and August 00 increase, $88 per metric ton. Generally, Adafina, that's what ARCMA used to be called, one of the many things it used to be called, has, one, realized a portion of the combined price increases at the smaller volume, for example, textile, distributor, and other non-contract accounts. Two, the larger volume, for example, pulp and paper, chemical process, other contract account increases, due to cap protection, will be delayed until January 1. And three, as new blocks of business are tendered, the business generally reflects the historical price, plus a portion of the increases. Close quote. I hope I didn't read that too rapidly. But what it says, is that for the increases in 2000, as far as ARCMA's customers were concerned, if you were a non-contract, smaller purchaser, you got hit immediately. If you were a contract, larger purchaser, you got hit January 1, the following year. And if you were a new customer, if you happened to have any of those, you got hit with a portion of it when, in fact, it came in the door. So those price increases, according to ARCMA's own documents, were effective. And they were the result of the price increase announcements, and they tracked on through to the transaction process. And that document, we'll be happy to put in evidence at trial. Because it is common proof that any plaintiff in this entire case, if they had their own individual case, would be presenting at trial. Because that is the standard. What are common questions? Common questions are those questions that any plaintiff would be presenting at trial. But here we're concerned about the predominance of common questions over individual questions. Absolutely right, Your Honor. But we've already talked about, a little bit, the market characteristics. Although I haven't gotten back to the charts and graphs, and I will. We've talked about the market characteristics that are basically unchallenged, although we should talk about DuPont. I'm sorry, I know too much. I keep going back and forth, and I do that briefly. DuPont, supposedly, is one of the issues. If you take a look... It reminded me when I was an associate, somebody would ask me what time it was, and I'd tell them how to make a watch. I hope I'm not doing that. No, you're doing a good job. I hope I'm not. With regard to DuPont, Dr. Byron did say in his affidavit in response to the Daubert motion, specifically, and he recited information, and he referenced information from one of the leading industrial organization textbooks, Carlton and Perloff. I don't remember the paragraph. I apologize for that. I think it was 24, but so was the last one, so I'm not sure that's true. Anyway, it's in his reply affidavit. He refers to the textbook, and what he essentially says is that there have been studies of cartels in the United States, and they show that the concentration ratio for the cartels is such that it ranges from 50% to 75%, even though there is a cartel, and the average is 66.7%. So even if DuPont were a factor, and this is what Dr. Byron says there, and I suggest this is what the district court actually relied on, even if DuPont had 30%, as it did up until really the middle of 1997, which is when it announced that it was going to get out of the market. And when did it get out? When did it get out? It got out at the end of 1998. What happened there, Your Honor, is that the FTC said, no, you can't sell all of your plants to Degusa, and so they sold only one plant to Degusa, one plant to Camara, and another one to Arkema, and so that took until 1998 for the FTC objection to be unwound and to be taken care of. But from the middle of 1997 to the end of 1998, there was only one price announcement that occurred in November of 1998. There were a couple of capacity shutdowns by FMC and Solvay in July 1998 and September 1998 that we also suggest, though it's not in this record, but we will be happy to do it at trial. DuPont exit from the market. Why isn't it that perhaps their exit, not the alleged price-fixing conspiracy, was the actual cause in price stabilization? Well, let's take a look, if we might. I was going to get back to the charts and graphs of what happens in the market, and I think I'd like to go to page 343 of the appendix, which actually is part of Dr. Ordover's presentation. I regret that you don't have it in front of you, but I'll be surprised just so you can see what it looks like. It's this chart here. It's in color, and what it's got is the average prices for all of the producers, and it's got lines for some of the price announcements. What it shows is that when DuPont was in the market in 1995, actually just before 1995, I said the first announcement was in August of 1994. The first one was effective September 14, 1994, which is the beginning of the class period. If you take a look at that line, the prices on a quarterly basis according to Dr. Ordover start to go up, not down, over time. Eventually it's down. Then again, the next one in January of 1995, prices keep going up. Pretty much all the way through the four or five announcements through January of 1996, prices go up and then they reach a peak. Then what happened, Your Honor, is that in the market, for pulp and paper, which is a major use of hydrogen peroxide, the EPA, I know you heard about the EPA earlier today, said we're going to do totally chlorine-free regulations, meaning that the pulp and paper folks couldn't use chlorine in their process. We would all have to use hydrogen peroxide. Everybody went out and either built a plant or expanded their plant. So that created overcapacity. That's the utilization. Prices died. They went down. But because that happened, it doesn't mean they wouldn't have died further if, in fact, the defendants weren't putting the brakes on. I'm not sure there was no price announcement because, after all, everybody knows the price is going down, but if you're getting together to meet and say, oh, we've got to be careful about how much of a discount we're going to do, we're not going to compete against you as much, those things can happen. In a price-fixing conspiracy, even as the prices are going down, and that's what happened from the middle of 1996 to roughly the end of 1998. As I already referenced, we've got two plant closures of their solar capacity, Solvay and FMC, and we've got price announcements November of 1998. And again, if you look at this chart, well, it looks like prices stabilized. And in fact, they may even start going up a little bit. And that's what happened. Then they come back down again at the end of 2001 to 2002. We all may remember that towards the end of 2001 there was something called September 11, as we refer to it. The economy wasn't in the best of all shape anyway, and so maybe that's why prices went down during that period. Nothing any car list could do or prevent. Even if you were a monopolist, you'd have to charge lower prices if the demand isn't there. And then after that, it stabilized, and sometimes it goes up as well. So if you take a look at the charts, and by the way, Dr. Byers got two similar charts like that. It's not that we're just using Dr. Ordo's charts for this. Dr. Byers got charts like that. It's his chart number three and his chart number nine. Dr. Byers is based on monthly data instead of quarterly data, but it shows the same things. And if you want to take a look at what's going on with the prices, see if I can find that for a moment. Dr. Ordo kindly provided us the backup to his analysis. Of course, he was required to do it under the rules. There we go. Oh, you're looking for that. Go ahead. Please, go ahead. No, it's more important to answer your question. I talk. I know you have a lot there that you would like to tell us about, but we heard from Mr. Bizarre that the district court made four specific mistakes in its analysis in this case. Do you want to respond to those points? Well, yes. He also referred to three other things as well. I know, you've touched on a little bit of that. May I start, not necessarily with the four specific mistakes, but maybe with something else. Well, I'd like to hear your answer to those sometime before you conclude. I would be happy to, but I will do that in this context if I might. Go ahead. Let me just refer you to pages 1069 to 1072 of the supplemental appendix is where Ordo's backup is. If you take a look at the changes quarter to quarter there, for example, in January of 95, April 15, 1995, December 1, 1998, you'll see that the quarter before versus the quarter that's the same as the announcement or just after the announcement depending upon the timing. For the most part, the prices for all of the defendants went up on average, so it's not quite that they went down after the price announcements and that too would be common proof. All right, let's talk about the questions of whether the court actually looked at what the experts were doing because I think that's the context for the four errors supposedly that the court below took or made. And the first one that I would like to talk about is slip of pen in page 18 and I want to put that in context a little bit beforehand. This is one of the points that my adversary was making which is that we've got stable to rising costs, we've got production capacity expanding, we've got a problem here you can't find either impact or pricing structure or even one regression whatever it might be. And if you take that apart, let's look at it from an economic point of view. First, stable to rising costs that would mean all other things being equal as an economist might say. The prices would go up. If you take a look at... I think part of what the problem they're saying is that Judge Dalzell who is referring to Dr. Byer's analysis. But what's he doing with respect to Dr. Horton? I'm trying to get there. I'm sorry I'm slow about it. So let me just jump. The economics... For me it all comes back to the first question I asked. Do you need a more searching inquiry when you analyze predominance? And that comes back to if you've got the market characteristics and the pricing structure and you analyze those that should be sufficient. And what Dr. Ordon did with his attacks on those here were rejected by the district court. And I'm about to do that right now because I'm concerned about it and I'll put aside what I was going to talk about. The first one is I was pointing out page 18 of the Slip Opinion. Here's what the court wrote. Defendants claim that because hydrogen peroxide prices fell during the class period despite rising costs plaintiffs cannot use the Boghossian shortcut. And cites two defendants memorandum of 20. This claim cannot be serious the district court wrote. And after two sentences said the fact that prices declined does not mean that defendants did not artificially inflate them on their way down. I submit that while the district court was being polite and referencing just the defendant's memorandum this is Dr. Ordon whose analysis Well when you tell somebody their argument is not serious that's not all that polite. Go ahead. It's also a reflection on the credibility of the people who are making the argument as well I would suggest. But the point is he goes into the alternative is in the next paragraph even if we were to define that the Boghossian shortcut did not apply here then he talks about buyer. Where does he really take into account a searching inquiry of Dr. Ordon Ordover's evidence? Well how searching of inquiry do you have to do if you're writing an opinion as a district judge is it enough to mention whether it is the facts that Ordover is proposing and saying we don't think that's a serious concern or saying we reject it or saying we don't agree with it. It probably would be a little more than just saying I reject it without giving a rationale. Okay well let's see if hopefully I can help a little bit on some of these points. Let me go to another one which is at pages 18 to 19 of the slip opinion. And again some background has to be stated. The court has gone through But I assume in the context of answering going through these things Absolutely. Okay. The background is I've got to tell you what the court is in its opinion below. Which is it's just discussed Dr. Byer's analysis of the market characteristics and the pricing structure. And it says quote either the market analysis or the pricing structure analysis would likely be independently sufficient at this stage. And skipping something despite defendant's claims to the contrary we should require no more plaintiffs in a motion for class certification. And then he drops footnote 13. And footnote 13 says defendants challenged the substance of Byer's pricing structure analysis would of course have carried more weight in the absence of his detailed market analysis. Because Byer presents both we have no difficulty in finding them collectively more than adequate. Close quote. Okay. So there even though he says it's defendant's challenge to the pricing structure I suggest that's a reference to what Dr. Orenover's analysis was with regard to the pricing structure. Let's take another one. You suggest that's a... Okay. You're disagreeing with me Judge. I'm not necessarily disagreeing with you. I don't know. Well I don't know how much more specific the district judge needs to be. That's what we're struggling with here. But certainly it's a reference to the arguments that well there was no correlation which of course there was. It's a reference to the arguments that there's individual pricing and that that somehow is preventing there being pricing structure. I mean those are the criticisms. It's a reference to the fact that the prices went up and down across some period of time. What else could it be a reference to? That was what the defendants and their expert were arguing. And that's what the district court is rejecting saying no I've got the market analysis and I've got pricing structure analysis which is supported by the marketing analysis. Which of course for most practical purposes is not being challenged here. Let me go to another one. Page 25 in the slip opinion. Note 21. Quote Defendants claim that complexities of negotiated prices in use across multiple industries distinguish this proposed class from any ever certified. Cites the defendants memorandum at 42. While we disagree I think this is actually quite similar to many other price fixing cases if the proposed class meets the requirements of rule 23 it would certify it even if it were unique. So again the judge below is disagreeing with defendants claim about the complexities of negotiating prices in use across multiple industries. That's certainly a claim of doctor order but that's not just a claim of the defendants it's not just a legal argument as they suggest in their reply on page 13 that actually was suggested this morning as well. There's another one on page 25 if I might indulge your honors. Quote We think our earlier discussion of predominance should make it clear that we disagree with defendants contention that certification of this class will require an inquiry into each and every negotiated purchase of a relevant product. The plaintiff alleged was impacted by the conspiracy. Close quote. Now isn't that Well that's more of a council's argument as opposed to doctor order. No I would suggest it's also doctor order's argument that individual pricing How many times in his opinion does he mention doctor order? Most twice. I won't disagree with my adversary with regard to that as I suggest he's being polite in saying defendants arguments without saying that he doesn't really believe what an economist is telling him even though when he says the argument can't be serious I suggest that that's exactly what he was trying to say. Okay good. Do you have any questions? I don't know if I answered your questions as well as Fisher as did before and I would be pleased to do so. You got close. Let me see let me just deal with one quickly if I may. Let me let me ask my colleagues if they have any more questions Mr. Harris.          Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire.                   Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire. Mr. Bessire.   President Obama. Robert Bussie. Thank you. The important point here is that the players have to do more than meet a mere burden of production. Okay? The West case, the Seventh Circuit case, said that if all they had to do in an antitrust case or a securities fraud case, for that matter, was meet a mere burden of production, they would accomplish class certification by hiring an expert. The standard would be antitrust plus class plus expert equals certification. That puts the rabbit in the hat. That's not the standard. The district court has an obligation to probe the basis of the expert's opinion to see if it squares with the facts. And the price increase announcements that are being offered here as common proof do not square with the question, with the fact of what happened in the market. Dr. Byers' reference to commodity prices and Mr. Aronson's reference to that, commodity products, this is not, we're not talking about pork bellies, a uniform product that's sold on a national commodity exchange. The question is not whether it's fungible or homogeneous, it's whether it's, how it's priced that determines whether it's a commodity or not. And, you know, a bottle of water is an example that appears in the Carlton and Perloff textbook, to which Mr. Aronson refers, as something where there's brand recognition that affects the pricing. It may be the same from bottle to bottle in terms of being H2O as a chemical, but the pricing may be widely different. And in a case like this where you're looking at impacts, that's what matters. Mr. Aronson referred to the pricing structure here, and I didn't have an opportunity to finish my remarks on that point during my opening statement. So let me just simply say that the pricing structure remarks that Dr. Byers makes in his report are based on average prices. In footnote 33 of Byers' opening report and in paragraph 21 at page supplemental appendix 1098 of his reply affidavit, which we never had an opportunity to challenge below, Dr. Byers makes it very clear that he's averaging prices, averaging prices across customers, across types of hydrogen peroxide products, and across suppliers. Well, if you take out the variances, if you put it all in a blender, you will get one average price. We have a lot of smart law clerks in this room, and I'm sure that some of them may have even gone to the University of Michigan Law School. And they would know, in that context, that if the class average... You're going to have to leave now. If the class average of a class, of the law and economics class at Michigan, is a B, some people in that class might have gotten an A, and some people might have gotten a C. Well, in any trust case where you're looking at whether there was an overcharge that affected everybody, if you're averaging the prices of all the customers and all the products, you may have some prices for customers who are overcharged and some who are not. And by averaging, you dilute the overcharge for those who were overcharged by those who are not. Dr. Byers dilutes the prices. He comes up with an average, which is not an appropriate way to test the principle he's testing. He uses fancy words like mitigate against compositional differences, but the point of the test for common impact is to see whether there are good variances. Good. One last point. Hold on a second. Let me ask... Any questions? No questions. Mr. Bizar, thank you very much. Okay. We thank both counsel for a very helpful argument. We would like a transcript of the argument made and parties to share in this. Please do this with the clerk's office. Thank you very much. Thank you. Thank you. Thank you.